1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLIFFORD TYRONE BROWN,

11          Petitioner,              No. CIV. S-02-1311 WBS GGH P

12      vs.

13   TOM L. CAREY, Warden, et al.,

14          Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Petitioner is a state prisoner proceeding pro se with an amended petition for writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction for

19   assault with a semi-automatic firearm (count 1; Cal. Penal Code § 245(b)), willful discharge of a

20   firearm at an occupied motor vehicle (count 2; Cal. Penal Code § 246), and being a convicted

21   felon in possession of a firearm (count 4; Cal. Penal Code § 12021(a)).[1]  The jury also found that

22   as to count 1, petitioner personally used a firearm (Cal. Penal Code § 12022.5(a)).  Petitioner is

23

24          [1] The state court appellate opinion identifies this count as count 4, but respondent and the
     prosecutor, in her closing argument, identified "12021" as the third of three counts against
25   petitioner.  Reporter's Transcript (RT), p. 445.  Defense counsel calls it count 4.  RT, p. 490.  On
     verdict forms, the counts were described as 1, 2, and 4.  Clerk's Transcript (CT), pp. 219-221;
26   RT, pp. 518-520.

1

1    serving a sentence of sixteen years.

2            By Findings and Recommendations, filed on May 13, 2004, this court

3    recommended denial of his original petition, which challenged his conviction on the following

4    grounds: 1) ineffective assistance of trial and appellate counsel (3 claims); and 2) improper

5    denial of petitioner's motion for a Marsden hearing transcript.  By Order, filed on June 10, 2004,

6    this court granted petitioner's May 24, 2004, motion to vacate the findings and recommendations

7    on the ground that petitioner sought to amend to include new claims.  Petitioner was informed

8    that the findings and recommendations would be re-instated, if appropriate, upon the resolution

9    of the new claims.

10           Thereafter, petitioner filed an amended petition on June 28, 2004.  On October 19,

11   2004, the court ordered respondent to show cause for his failure to respond to the amended

12   petition, the court having previously directed such a response by Order, filed on June 10, 2004.

13   By Order, filed on November 10, 2004, the court found that respondent had discharged the show

14   cause order by a timely response on October 22, 2004, and granted respondent a thirty-day

15   extension of time to file a response.  On December 9, 2004, respondent filed an answer to the

16   amended petition to which petitioner filed a traverse on January 11, 2005.

17           In his amended petition, petitioner challenges his conviction on the following

18   grounds: 1) prosecutorial misconduct; 2) unconstitutional jury instruction; 3) ineffective

19   assistance of counsel for failing to challenge the sufficiency of the evidence for prior conviction,

20   failure to interview alibi and other witnesses and subpoena them to present a defense, and failure

21   to present a witness corroborating the defense of self-defense; 4) insufficient evidence as to prior

22   conviction.  Amended Petition (AP), pp. 5-6.

23   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

24           The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

25   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

26   138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

1   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

2   standards of review to be used by a federal habeas court in assessing a state court's adjudication

3   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

4   (9th Cir. 1997).

5         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

6   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

7   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

8   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

9   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

10   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

11   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

12   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

13         "Unreasonable application" of established law, on the other hand, applies to

14   mixed questions of law and fact, that is, the application of law to fact where there are no factually

15   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

17   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

18   deference is not blindly automatic, "the most important point is that an *unreasonable* application

19   of federal law is different from an incorrect application of law....[A] federal habeas court may not

20   issue the writ simply because that court concludes in its independent judgment that the relevant

21   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

22   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

23   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

24   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

25   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

26   \\\\\

1    The state courts need not have cited to federal authority, or even have indicated

2  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7  established Supreme Court authority reviewed must be a pronouncement on constitutional

8  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

10   However, where the state courts have not addressed the constitutional issue in

11  dispute in any reasoned opinion, the federal court will independently review the record in

12  adjudication of that issue.  "Independent review of the record is not de novo review of the

13  constitutional issue, but rather, the only method by which we can determine whether a silent state

14  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15  2003).

16  III.  Background

17   The opinion of the California Court of Appeal contains a statement of facts.  After

18  independently reviewing the record the court finds this statement to be accurate and adopts it

19  below.

20   Angela Pickens, the victim, had a history of conflict with
      defendant's brother, Alex Brown.  In March 1997, Pierre Briscoe
21   (originally charged as a codefendant) came with Alex Brown to
      Pickens's home and threatened her with a gun. [Footnote 1]

22

23   [Footnote 1:  Briscoe successfully moved to sever
      his trial from defendant's.]

24   In July 1997, defendant called Pickens and said:  "Bitch, I heard
      you was [sic] disrespecting my brother."

25

26   On August 7, 1998, Pickens was driving down Mack Road in
      Sacramento.  She saw defendant and Briscoe in a green Ford

1   Explorer, with Briscoe driving.  Defendant waved at her.  The
    Explorer came up very close to her vehicle, then began weaving
2   towards her as if it were trying to run her off the road.  Then it
    pulled behind Pickens and to her left.  Looking out her rear view
3   mirror, she saw defendant pointing a handgun at her.  He fired
    several times, hitting her vehicle.  She escaped the situation and
4   called the police.

5   Cindy Butler, who was also driving down Mack Road at that time,
    corroborated Pickens's testimony that the passenger in the Explorer
6   fired several shots at Pickens's vehicle.

7   Investigating officers found a bullet and two or three bullet holes in
    Pickens's vehicle.  Pickens identified the persons in the Explorer as
8   defendant and Briscoe.  When the police detained defendant and
    Briscoe, they found an empty black .380-caliber handgun on the
9   passenger's side of the Explorer, in the center console; Briscoe
    admitted owning the gun.  Testing of the bullet found in Pickens's
10  vehicle showed that it came from that gun.

11  Testifying on his own behalf, defendant claimed that he fired in
    self-defense.  According to defendant, Pickens's vehicle was
12  driven by her boyfriend, Raymond Lynch, who pursued Briscoe's
    Explorer, tried to force it off the road, then pulled out a gun.
13  Briscoe opened the center console and told defendant to pick up
    the gun (which defendant had not known was there until that
14  moment).  Defendant and Lynch fired simultaneously.

15  On rebuttal, Briscoe's wife testified that defendant had lived with
    the Briscoes in the period just before the incident.  Briscoe had
16  bought a handgun in July 1998 which he kept at home by night and
    in the center console of the Explorer by day.  Several times before
17  the incident, the Briscoes and defendant went to the Explorer
    together as her husband carried the gun in his pocket to the vehicle.
18  After the incident, defendant told Mrs. Briscoe that he would be in
    a lot of trouble if he said he knew where the gun was; therefore he
19  was going to say he did not know where it was.

20  Amended Petition (AP), Exhibit (Ex.) B, pp. 2-4; respondent's Answer, Exhibit D, pp. 2-4.

21  IV.  <u>Discussion</u>

22          A.  <u>Claim 1</u> -  <u>Prosecutorial Misconduct</u>

23          *<u>Legal Standard</u>*

24          Success on a claim of prosecutorial misconduct requires a showing that the

25  conduct infected the trial with unfairness so as to make the resulting conviction a denial of due

26  process.  <u>Greer v. Miller</u>, 483 U.S. 756, 765, 107 S. Ct. 3102, 3109 (1987) (quoting <u>Donnelly v.</u>

5

1   DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)).  The conduct must be examined

2   to determine "whether, considered in the context of the entire trial, that conduct appears likely to

3   have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

4   Simtob, 901 F.2d 799, 806 (9th Cir. 1990).

5          The appropriate standard of review for a claim of prosecutorial misconduct on a

6   writ of habeas corpus is "the narrow one of due process, and not the broad exercise of

7   supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)

8   (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 1871 (1974)).

9   According to the Supreme Court, "the touchstone of due process analysis in cases of alleged

10  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith

11  v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 947 (1982).  Thus, the federal habeas court must

12  distinguish between "ordinary trial error of a prosecutor and that sort of egregious

13  misconduct . . . amount[ing] to a denial of constitutional due process."  Id., 102 S. Ct. at 947.

> Improper prosecutorial argument violates rights under the federal
> constitution if it "'so infected the trial with unfairness as to make
> the resulting conviction a denial of due process.'" Darden v.
> Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144
> (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94
> S.Ct. 1868, 40 L.Ed.2d 431 (1974)).  It "is not enough that the
> prosecutor[']s[] remarks were undesirable or even universally
> condemned." Id. (internal quotation marks omitted).

19  Allen v. Woodford, 395 F.3d 979, 997-998 (9th Cir. 2004).

20          In Darden v. Wainwright, at 181-82, 106 S. Ct. at 2471-72,  the high court, in

21  dicta, does distinguish the prosecutor's argument therein, noting that it "did not manipulate or

22  misstate the evidence, nor did it implicate other specific rights of the accused such as the right to

23  counsel or the right to remain silent."  In a case, not apposite to this one in that there is no claim

24  that defendant's argument was improper and in that it involves a federal prisoner's direct appeal

25  and the plain-error doctrine of Fed. R. Crim. Proc. 52(b), the Supreme Court has noted that, "in

26  closing argument to the jury," while "the lawyer may argue all reasonable inferences from the

1    evidence in the record[,] [i]t is unprofessional conduct for a lawyer intentionally to misstate the

2    evidence or mislead the jury as to the inferences it may draw." U.S. v. Young, 470 U.S. 1, 10,

3    105 S. Ct. 1038, 1043, n. 7, quoting ABA Standard for Criminal Justice 4-7.8.  In U.S. v. Young,

4    470 U.S. 1, 105 S. Ct. 1038 (1985), the Supreme Court found that improper prosecutorial

5    remarks made in rebuttal argument had to be evaluated in the context of improper defense

6    argument and did not rise to the level of "plain error" that a reviewing court could act on in the

7    absence of a timely objection.  The Ninth Circuit has long observed that failure to object to a

8    prosecutor's remarks renders prosecutorial misconduct claims procedurally barred.  Hall v.

9    Whitley, 935 F.2d 164, 165 (9th Cir. 1991).

10                    *Misstating the Evidence*

11            Petitioner contends that the prosecution violated his due process rights and

12    prejudiced him during closing argument by misstating the evidence and by referring to

13    petitioner's prior conviction in violation of a stipulated agreement, committing reversible error.

14    AP, p. 5.  The specific alleged misstatement of the evidence by the prosecutor at issue (italicized

15    herein) comes in the context of the prosecutor seeking to ascribe to petitioner a motive for the

16    shooting, as follows: "And does Clifford Brown have a motive?  And as sure as I'm standing

17    here before you, he does.  *And Clifford Brown also told you on the stand - - I asked him, 'Didn't*

18    *you ever go to their house?'  'Yeah, I went over to their house to get some money for something*

19    *they owed me for,' something about a car."*  RT 458.   The record of the argument indicates that

20    no contemporaneous objection was made at the time the prosecutor made the statement.  On

21    petitioner's motion for a new trial, the trial court identified the statement as constituting

22    misconduct, whether intentional or not, but noted that defendant had failed to make a timely

23    objection and request an admonition, which could have corrected the misstatement and any

24    negative impact therefrom.  RT, p. 633.[2]

25    ───────────────

26        [2]  A portion of the trial court's discussion on this issue, upon petitioner's motion for a
     new trial, includes the following: "Initially, what the court would have to note is that it does

                                                     7

Petitioner frames the claim more specifically in his reply/traverse than he does in the amended petition.  Petitioner claims that the prosecutor's misstatement suggests that petitioner had a motive for shooting at Ms. Pickens and that the motive was that she owed him money for a car.  Reply, pp. 13-14.  Petitioner maintains, however, that he never testified that he had gone to Pickens' house; that he had, in fact, never gone to Ms. Pickens' house nor did she owe him money; and that the false statement gave the jury a reason to believe that petitioner would shoot at Pickens because she owed him money.  Id.  Petitioner cites the portion of his (cross-examination) testimony speaking to the issue:

> Q.  And, actually, on one occasion you went with her[3] to go over to Angela Pickens' home, didn't you?
>
> A.  No, that's not correct.
>
> Q.  Did you go with her by Angela Pickens' house?
>
> A.  I went with her and her mother to sit on what I believe was 16th Avenue, or something like that, San Carlos, I'm not sure what San Carlos and 17th - - which direction either one would run, but it was down the street from her house waiting for the police officer to arrive to mediate the situation between Shaunda and her auntie.

Reply, p. 13; RT, p. 321.   This court finds in its review of petitioner's testimony that petitioner, indeed, did not testify that he had gone to Ms. Pickens' house or that she owed him money.  Petitioner points out that his defense was self-defense and contends that the false attribution of a

---

appear that this is a misstatement or, at a minimum - - I don't know if it was - - if it was something which - - how to really, truly characterize - - is on a continuum - - maybe that's not even necessary.  It is something that, in all likelihood, is - - I don't think it rises to the level of asserting a fact that has not been proven, but it certainly is a misquoting of what the evidence is.  And that, in and of itself, I believe, does constitute misconduct, even though it may not have been intentional; however, the law indicates that - - that the Court - - that a defendant must make a timely objection at the trial and request an admonition; otherwise, the point is reviewable only if the admonition would not have cured the harm caused by the misconduct. [¶] It appears to me that an objection at the time could have easily corrected the misstatement as to what the nature of the evidence actually was, and that didn't exist.  That did not happen."  RT 633-34.

[3]  The "her" in the prosecutor's questions and in petitioner's testimony with regard to whom he accompanied refers to petitioner's brother's girlfriend, Shaunda Snell.

motive for him to shoot at Angela Pickens amounted to an unsworn witness not subject to cross-examination undercutting his defense.  Reply, p. 14.  Petitioner notes the trial court's discussion of the issue upon the new trial motion, as set forth in footnote 2, but maintains the conduct was prejudicial in that in order for the jury to consider the self-defense position, petitioner could not have a false motive attributed to him.  Id.  Petitioner notes that the trial court did not find that the failure to object rose to the level of ineffective assistance of counsel.  Id.  In a footnote (footnote 6 of his traverse), petitioner appears to attempt to backdoor a claim of ineffective assistance of counsel as to his counsel's failure to object because at the motion for a new trial, the failure to object was argued by new defense counsel as not based on any legitimate trial strategy,[4] but petitioner herein has not properly raised an ineffective assistance of counsel claim as to this straight claim of prosecutorial misconduct,[5] and the claim arising from the misstatement, as well as to the prosecutor's reference to the stipulation, proceeds only as to the straight claim.

The state court of appeal set forth as to this claim the following:

> Defendant contends the prosecutor committed prejudicial misconduct in her closing argument by misstating the evidence and by violating a stipulation between the parties as to defendants prior offense.  We conclude the contention is waived because defendant failed to make a timely objection and request a curative admonition as to either alleged act of misconduct.  (People v. Davis (1995) 10 Cal.4th 463, 505-506.)  Defendant's fallback assertion of ineffective assistance of counsel is also waived because it is raised

---

[4] Indeed, petitioner's new trial counsel (evidently hired primarily for the purpose of moving for a new trial), argued that petitioner's trial counsel who did not object when the misstatement was made "indicated that he did not recall the statement....  Whether that means that he didn't hear it or just didn't recall because of the passage of time, I don't know, but he did indicate that he did not recall that and had - - had no tactical reason for not objecting to the matter."  RT, p. 636.

[5] Another effort to backdoor an ineffective assistance of counsel claim for petitioner's trial counsel's failure to object comes later in his traverse at pages 17 and 18, but petitioner, by failing to assert such a claim in the amended petition has deprived respondent of the opportunity to oppose the claim, either on the ground that it is unexhausted or on a substantive ground, and the court is unable to reach the claim for its having been raised at the wrong stage of the proceedings.  Cacoperdo v. Demosthenes, 37 F.3d 504 (9th Cir. 1994) ("[a] [t]raverse is not the proper pleading to raise additional grounds for relief.  In order for the State to be properly advised of additional claims, they should be presented in an amended petition....")

cursorily only in a footnote and is not separately headed.  (Cal. Rules of Court, rule 15(a); Opdyk v. California Horse Racing Bd. (1995) 34 Cal. App.4th 1826, 1830-1831, fn. 4.)

Defendant asserts first that the prosecutor misstated the evidence by falsely claiming that defendant admitted having gone to the victim's house before the incident to get money in payment of a debt.  Assuming that this was a misstatement of the evidence there is no reason why a timely objection and an admonition to the jury to disregard the misstatement could not have cured any possible harm.  Therefore, this claim of error is waived.  (People v. Davis, supra, 10 Cal.4th at pp. 505-506.)

AP, Ex. B, p. 4; respondent's Ex. D, p. 4.

Defendant asserts next that the prosecutor violated a stipulation between the parties as to his 1992 juvenile adjudication.  Like the previous claim of error, this one is waived for failure to object or request an admonition when the supposed misconduct occurred.

The parties agreed to the following stipulation: "On or about September 4, 1991, Clifford Tyrone Brown was in the company of three other persons.  Two persons from his party stole a vehicle from the person and the presence of Mr. Steve Perez by use of a handgun.  Though Mr. Brown did not actively partake in the initial theft of the vehicle, he was present. [¶]  Mr. Brown was later seen by Mr. Ed Sherwood operating the vehicle approximately an hour afterwards."  In the prosecutor's first closing argument, however, after reciting this stipulation, the prosecutor added.  "Sounds like a robbery to me."  Defendant did not object or request an admonition at the time.

The parties and the trial court apparently discussed this point later in an unrecorded sidebar conference.  Afterward, to avoid the problem whether the jury would have to be instructed on the elements of robbery in order to decide whether defendant's prior conduct amounted to a felony, the parties agreed to a new stipulation that defendant's conduct did amount to a felony.  Counsel then so stipulated before the jury. [fn 2]

> [fn 2] In a subsequent new trial motion, defendant assigned both instances of alleged prosecutorial misconduct as reversible error.  Defense counsel asserted that he had objected to the prosecutor's "robbery" comment at the unrecorded sidebar.  The prosecutor replied that the original stipulation did not bar that comment.  The trial court agreed with both counsel, finding that there had been an objection but that the prosecutor's comment was not misconduct.  The court also found that there had

been no objection to the prosecutor's alleged misstatement of the evidence.

Even if counsel objected at the unrecorded sidebar, that objection was not timely.  Moreover, whether or not he ever objected, he never requested an admonition to the jury.  Instead, he agreed to a new stipulation, apparently concluding that that was sufficient to cure any possible harm.  For both reasons, the claim of prejudicial misconduct is waived.  (People v. Davis, supra, 10 Cal.4th at pp. 505-506.)

Because defendant's claims of prejudice are waived, we need not decide whether the prosecutor actually committed misconduct in either instance.  In any event, we see no possibility of prejudice on these facts.  The victim's testimony was corroborated by an impartial eyewitness and by the physical evidence and the jury evidently found defendant's uncorroborated story unbelievable.  Thus, there is no reasonable possibility that defendant would have obtained a better outcome absent the prosecutor's alleged misconduct.

Id., at pp. 4-6.

Respondent first argues that petitioner's challenges to the prosecutor's

misstatement of the evidence and to the prosecutor's reference to his prior conviction in violation

of the stipulations are procedurally barred.

If a federal constitutional claim is expressly rejected by a state court on the basis

of a state procedural rule that is independent of the federal question and adequate to support the

judgment, the claim is procedurally defaulted.  House v. Bell, ___ U.S. ___,126 S. Ct. 2064,

2076 (2006) ("[a]s a general rule, claims forfeited under state law may support federal habeas

relief only if the prisoner demonstrates cause for the default and prejudice from the asserted

error[,]" citing Murray v. Carrier, 477 U.S. 478, 485, 106 S.Ct. 2639 (1986); Engle v. Isaac, 456

U.S. 107, 129, 102 S. Ct. 1558 (1982); Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497

(1977) ; see also Coleman v. Thompson, 501 U.S. 722, 729-730, 111 S. Ct. 2546, 2554-2555

(1991); Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003).  Habeas review of procedurally

defaulted claims is barred unless the petitioner demonstrates cause for the procedural default and

actual prejudice, or that the failure to consider the claims will result in a miscarriage of justice.

1   <u>Coleman</u>, 501 U.S. at 750, 111 S. Ct. at 2565.[6]

2         The California Court of Appeal, as set forth above, found that petitioner's claim

3 challenging the prosecutor's misstatement of the evidence was waived because he did not

4 specifically object on this ground in the trial court.  As to the challenge to the prosecutor's

5 mention of petitioner's prior conviction, this too was waived, on the basis of an untimely

6 objection and because no curative instruction or admonition was sought.  Accordingly, these

7 claims of prosecutorial misconduct are procedurally defaulted unless petitioner can demonstrate

8 cause and prejudice or a miscarriage of justice.  <u>See</u> <u>Paulino v. Castro</u>, 371 F.3d 1083, 1092-93

9 (9th Cir. 2004) (California's contemporary objection rule precludes federal habeas review).

10         Petitioner does not challenge the validity per se of the procedural bar in this case.

11 Without specifying how it should be addressed, respondent argues that petitioner

12 makes no attempt to show cause and prejudice.  Answer, p. 13.  This generalized contention is

13 borne out by petitioner's failure to even broach the subject in his amended petition.  While he

14 does address it in his traverse (pp. 18-19), he tries to frame it only in the context of an ineffective

15 assistance of counsel claim inapposite in this amended petition, as noted earlier, and discussed

16 briefly below.

17         Petitioner, indeed, makes no effort to show cause for his counsel's failing to

18 object timely.  This may well be because there can be no such showing in the circumstances and

19 posture of the claim petitioner makes in this case.  In <u>Murray v. Carrier</u>, 477 U.S. 478, 486, 106

20 S. Ct. 2639, 2644 (1986), the Supreme Court stated that the decision in <u>Engle</u>[7] made clear that

21 "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to

22

23       [6] "Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted.  In certain exceptional cases involving a compelling claim of actual innocence, however, the state

24 procedural default rule is not a bar to a federal habeas corpus petition. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 319-322, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)." <u>House v. Bell</u>, <u>supra</u>, 126 S. Ct.

25 at 2068.

26       [7] <u>Engle v. Isaac</u>, 456 U.S. 107, 102 S. Ct. 1558 (1982).

raise the claim despite recognizing it, does not constitute cause for a procedural default."   The

Court discerned "no inequity in requiring [a defendant] to bear the risk of attorney error that

results in procedural default," if a defendant's counsel's performance does not fall to such a level

as to constitute ineffective assistance pursuant to the standard set forth in Strickland v.

Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).   Murray, supra, at 488, 106 S. Ct. at 2645.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner

can show some objective factor external to the defense impeded counsel's efforts to comply with

the State's procedural rule." Id.

> "A showing of cause 'must ordinarily turn on whether the prisoner
> can show that some objective factor external to the defense
> impeded [prisoner's] efforts to comply with the State's procedural
> rule.' " Pizzuto v. Arave, 280 F.3d 949, 975 (9th Cir. 2002)
> (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91
> L.Ed.2d 397 (1986)). "Thus, cause is an external impediment such
> as government interference or reasonable unavailability of a claim's
> factual basis." Id. (citing McCleskey v. Zant, 499 U.S. 467, 497,
> 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991))."

Robinson v. Ignacio, 360 F.3d 1044, 1052 (9th Cir. 2004).

Petitioner has made no showing whatever for cause on the basis of any "external

impediment" hindering his trial counsel, resulting in his failure to contemporaneously object to

the prosecutor's statements or to the reference to the prior conviction.  While, on the other hand,

ineffective assistance of counsel does constitute cause for procedural default, "the exhaustion

doctrine...generally requires that a claim of ineffective assistance be presented to the state courts

as an independent claim before it may be used to establish cause for a procedural default."  Id., at

488-89, 106 S. Ct. at 2645-46.   This is so because:

> if a petitioner could raise his ineffective assistance claim for the
> first time on federal habeas in order to show cause for a procedural
> default, the federal habeas court would find itself in the anomalous
> position of adjudicating an unexhausted constitutional claim for
> which state court review might still be available.

Id., at 489, 106 S. Ct. at 2646.

See also Cochett v. Ray, 333 F.3d 938, 943 (9th Cir. 1003) (in order for ineffective assistance of

1   counsel to be used as "cause" for default, the ineffective assistance claim must be exhausted).

2          As previously noted, petitioner has not even properly framed herein an ineffective

3   assistance of counsel claim as to the allegations of prosecutorial misconduct, and the state court

4   appellate's decision set forth above makes clear that such a claim was never properly before (or

5   considered by) that court.

6              Defendant's fallback assertion of ineffective assistance of counsel
               is also waived because it is raised cursorily only in a footnote and
7              is not separately headed.  (Cal. Rules of Court, rule 15(a); Opdyk
               v. California Horse Racing Bd. (1995) 34 Cal. App.4th 1826,
8              1830-1831, fn. 4.)

9   AP, Ex. B, p. 4; respondent's Ex. D, p. 4.

10         Nor does petitioner appear to have ever raised such an ineffective assistance of

11  counsel claim as to his allegations of prosecutorial misconduct in any state court habeas petition.

12  Thus, this court cannot analyze the failure to object to the prosecutor's misstatement as a claim of

13  ineffective assistance of counsel.  Because petitioner fails to show cause for the procedural

14  default, the court need not assess whether prejudice resulted therefrom because it is necessary

15  that petitioner show both cause *and* prejudice in order for the court to reach such a claim as

16  posed herein on the merits.  Murray, supra, at 494, 106 S. Ct. at 2649 ("*[B]oth* cause and

17  prejudice must be shown, at least in a habeas corpus proceeding challenging a state court

18  conviction.")[8]  The Ninth Circuit has found that in such circumstances the federal court need not

19  address the argument on the merits.  Paulino v. Castro, 371 F.3d at 1093 n. 8.

20             Paulino fails to demonstrate that we can nevertheless consider his
               claim. He nowhere argues that California's contemporary-objection
21             rule is unclear, inconsistently applied or not well-established, either
               as a general matter or as applied to him. See Melendez v. Pliler,
22             288 F.3d 1120, 1124 (9th Cir. 2002). Nor does he suggest that
               there was cause for his procedural default, or that a miscarriage of
23             justice would result absent our review. See Coleman, 501 U.S. at
               748, 111 S.Ct. 2546; see also Vansickel v. White, 166 F.3d 953,
24             957-58 (9th Cir.1999). Our review is therefore barred by
               independent and adequate state grounds.  See Coleman, 501 U.S. at

25

26      [8] Emphasis in original.

1        729-30, 111 S.Ct. 2546.

2  Paulino, supra, at 1093.

3            "Under Sykes[9] and its progeny, an adequate and independent
            finding of procedural default will bar federal habeas review of the
4            federal claim, unless the habeas petitioner can show 'cause' for the
            default and 'prejudice attributable thereto,' Murray v. Carrier, 477
5            U.S. 478, 485 [106 S.Ct. 2639, 2644, 91 L.Ed.2d 397] (1986), or
            demonstrate that failure to consider the federal claim will result in
6            a ' " 'fundamental miscarriage of justice.' " ' Id., at 495 [106 S.Ct.,
            at 2649], quoting Engle v. Isaac, 456 U.S. 107, 135 (1982). See
7            also Smith v. Murray, 477 U.S. 527, 537 [106 S.Ct. 2661,
            2667-2668, 91 L.Ed.2d 434] (1986)." Harris, 489 U.S., at 262, 109
8            S.Ct., at 1043.

9  Coleman v. Thompson, 501 U.S. at 749-50, 111 S. Ct. at 2564-65 (1991), quoting Harris v.

10  Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989).

11        It is only in the "extraordinary case, where a constitutional violation has probably

12  resulted in the conviction of one who is actually innocent," that "a federal habeas court may grant

13  the writ even in the absence of a showing of cause for the procedural default." Murray, supra, at

14  496, 106 S. Ct. at 2649; cf. Smith v. Baldwin, 466 F.3d 805, 812 (9th Cir. 2006) (because

15  petitioner made a sufficient showing of actual innocence to overcome any procedural default as

16  to all claims, determination whether he could make the alternative showing of cause and

17  prejudice as to some claims unnecessary).

18        The record does not militate for a finding that the court cannot have confidence in

19  the trial's outcome in this case.  By reference to this alleged error, or in any other way, petitioner

20  does not affirmatively demonstrate actual innocence.  Prior to the closing arguments the court

21  delivered, inter alia, the following instructions to the jury, which the court informed the jury

22  would also be available in written form in the jury room during deliberations (RT 425):

23            You must base your decision on the facts and the law.

24            You have two duties to perform.  First, you must determine what
            facts have been proven from the evidence received in the trial, and

25

26        [9] Wainright v.Sykes, 433 U.S. 72, 97 S. Ct. 2497 (1977).

                                    15

not from any other source.  A fact is something proved by the evidence or by a stipulation.  A stipulation is an agreement between the attorneys regarding the facts.  Second, you must apply the law that I state to you to the facts, as you determine them....

You must accept and follow the law as I state it to you, regardless of whether you agree with the law.  If anything concerning the law said by the attorneys in their arguments, or at any other time during the trial, conflicts with my instructions on the law, you must follow my instructions.

.......................................................................................

Statements made by the attorneys during the trial are not evidence; however, if the attorneys have stipulated or agreed to a fact, you must regard that fact as proven.

.......................................................................................

You must decide all questions of fact in this case from the evidence received in this trial, and not from any other source.

.......................................................................................

Evidence consists of the testimony of the witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or nonexistence of a fact.

RT 425-427.

Motive is not an element of the crime charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish the defendant is guilty.  Absence of motive may tend to show the defendant is not guilty.

Evidence has been received from which you may find that an oral statement of motive was made by the defendant before the offense for which he is charged was committed.  It is for you to decide whether the statement made by - - it is for you to decide whether the statement was made by the defendant.

RT 432-433.

Earlier, during the trial, at the point when a stipulation was received by the court, the trial judge clarified and distinguished the significance of a stipulation:

Ladies and gentlemen, when the attorneys have stipulated, it is the one exception to the rule that what they say is not evidence.  What it means to you, this stipulation, is that the facts as stated by

16

counsel are now conclusively proven to you.  They are no longer in
controversy.

RT 196.

Moreover, the prosecutor's argument about petitioner's alleged motive does not

rely solely or even primarily on her misstatement or mischaracterization of petitioner's

testimony.  As respondent points out, the evidence in the record as to motive is extensive.  Put in

context, the misstatement is virtually swallowed by the prosecutor's broad-sweeping argument

about petitioner's motive:

> The Judge instructed you motive is not an element of the crime
> charged and need not be shown; however, you may consider
> motive or lack of motive as a circumstance in this case.  Presence
> of motive may tend to establish the defendant is guilty.  Absence of
> motive may tend to show that the defendant is not guilty.
>
> Well, do we have motive here?
>
> Let's see what we got.  And we're going to talk about Mr. Brown
> and the many motives that Mr. Brown has.
>
> One, Angela Pickens said, "Hey, you know, about a year ago" - -
> and the defendant told you Alex Brown was locked up.  He can't
> take care of things for himself at that time.  So his brother calls
> Angela, says, "Bitch, why are you disrespecting my brother?  Don't
> be disrespecting my brother, bitch."
>
> She's like, "I'm not doing anything."
>
> "Well, just don't be disrespecting my brother."
>
> Well, Clifford Brown at this time took it up.  He decided, you
> know, "I'm going to be my brother's keeper.  I'm going to take
> care of it."
>
> Now, all of us may not take care of things to that extreme.  If my
> brother needs 20 dollars, we're going to give it to him.  We will
> help him out.  That's my brother.  All of us may not go to our
> extreme, but we have to know in everyday life experiences that
> there are individuals out there that will back up their brother and
> will do so to this degree.  We know that.  Common sense tells us
> that.  Our life experiences tell us that.
>
> And we also know that the defendant has backed up his brother on
> a prior occasion.  So we don't even have to make a jump, not even

17

a step, to say, "What are you doing?" because we know that he's done it before.

And he was asked these questions specifically: "Weren't you present when your brother confronted John Brooks?"

"Yes."

"And prior to that confrontation, did you not say if someone used force against your brother, you would intercede with force?"

"Yes."

"And someone did use force against your brother, and didn't you, in fact, intercede with force?"

"Yes."

So what do we know about Clifford Brown?

He's going to go back up his brother.  And if it means using force, he's going to go do it.

Now, some of you might say, "Well, okay.  Okay, that sounds good, Miss Luna, but Alex Brown wasn't there, and there wasn't any force used on him at this time.  So how do you explain that?"

Well, what do we know that's been going on?

We know that Angela Pickens has been very diligent.  She has been concerned.  Here is a man that goes up to her house and puts a gun on her and her babies.  And Alex Brown knows and Clifford Brown knows she's calling the police because she wants something done.

And what's going to happen to Alex Brown once they catch him?

What's going to happen?

Angela Pickens is going to follow through.  She's not going to stop.  She is going to proceed because she wants to be safe, and she wants her babies to be safe.

"And does Clifford Brown have a motive?  And as sure as I'm standing here before you, he does.  *And Clifford Brown also told you on the stand - - I asked him, 'Didn't you ever go to their house?'  'Yeah, I went over to their house to get some money for something they owed me for,' something about a car.*" [10]

---

[10] Emphasis added-the italicized portion constitute the misstatements of the evidence.

18

Well, you know what?

He's helping him out, isn't he?

Who was Shauna?[11]

Alex Brown's girlfriend.  That's who shows us does he go and help out?

Yes, he did.

Did he at that time?

Yes, he did.

And then we have Huck.  The most obvious motive: Here's a guy that let the defendant live in his house for two months, let him live with him.  They are musicians together.  They go conduct their business together.  And we know Huck has a beef because Angela Pickens told you that.  She filed a report with his name in the months prior to this.  There is prior conduct between Huck and this victim even before this happened.

And you mean to tell me they aren't best friends.

They don't talk about it?

They don't mention it?

"Hey, man, yeah, Angela called the police on me and said I'm involved."

Even if he says that's bullshit, one way or the other, you mean they don't talk about it?

Clifford Brown's own brother is involved.

They don't talk about it?

I don't care if you believe Clifford Brown for a minute, says, "Oh, we're not talking right now."  It's still his brother.  It's just not, "Let's just not talk about it."  That's a lie.

So, in terms of motive in this case, it's all over the place.  Every time you turn around, his motivation for doing it is there, and it exists.

RT 456-459.

_____

[11] This is a misspelling of "Shaunda."

19

1          The record of the argument demonstrates that, except for the italicized statement,

2    the prosecutor has based her argument on testimony provided by the witnesses, including

3    petitioner.  For example, at RT 55, 58, Angela Pickens testifies that the petitioner's brother, Alex

4    Brown, had been at her door "a couple of times," pointing a gun at her and threatening to kill her

5    and her children, that several police reports had been made by her concerning such incidents.

6    Pickens testifies that she had reported an incident to police involving Huck as well, and that

7    Huck (Pierre Briscoe) often accompanied Alex Brown when Brown (petitioner's brother)

8    threatened her.   RT 55-56.  Angela Pickens testifies that petitioner had said: "Bitch, I heard you

9    was disrespecting my brother."  RT 59.   There was testimony from an independent witness,

10   Cindy Butler, one who did not know any of the parties, but happened to be driving down Mack

11   Road on August 7, 1998, when shots were fired from what was later identified as the vehicle in

12   which Pierre Briscoe was driving with petitioner as a passenger.  RT 122-125.  She memorized

13   and wrote down the license plate number of the vehicle from which shots were fired and called

14   911.  RT 127-128.  This witness was not certain whether or not there were two people in the car

15   that Angela Pickens (gray Suburban) was driving but was more sure that a woman was driving;

16   she was, however, quite sure two people were in the car in which petitioner was a passenger

17   (green Ford Explorer); she only witnessed shots fired from the car petitioner was in.  RT 128-

18   134.   A black .380-caliber handgun was found in the vehicle's passenger side but no bullet holes

19   were found in or on the vehicle in which petitioner was a passenger, nor was there any other

20   damage, such as a sideswipe might leave, according to the police detective, Teachout, who

21   located the suspects, followed and had them arrested, matching the Explorer with the license

22   number which had been provided to police by the witness, Cindy Butler.  RT 142-149.   Another

23   officer, Watson, who arrived at the arrest scene and assisted in the investigation, conducted a

24   search of the vehicle, located the handgun in the center console of the Explorer, but saw no bullet

25   holes or scrape damage in or on the vehicle.  RT 166-169.  Expert testimony was offered to prove

26   the gun in the Explorer was the weapon which fired a bullet that was located in the gray

1   Suburban driven by Ms. Pickens; the criminalist, Moran, also identified bullet holes and a

2   ricochet in photographs of the Suburban.  RT 172-174, 176, 180, 220-223.  Petitioner testified,

3   relating his version of the incident, including that the Suburban was driven by Raymond Lynch

4   with Angela Pickens as a passenger; that Lynch deliberately swerved into the Explorer twice; that

5   Lynch pointed a gun first; that petitioner was shown where the weapon was that he shot by the

6   Explorer's driver, Pierre Briscoe; that petitioner shot only to stop Lynch's shooting at him and at

7   Briscoe.  RT 272, 275-276, 279-284.

8          Under cross-examination, petitioner denied that there was any problem between

9   Pierre Briscoe and Angela Pickens; denied knowing that Ms. Pickens had called the police

10   concerning either Pierre Briscoe or petitioner's brother; denied knowing that the police had

11   stopped his brother concerning her call; denied having spoken with his brother in August of 1998

12   (when the incident occurred).  RT 320.  At that point in his testimony, petitioner testifies, as has

13   been set forth earlier, that he did accompany Shaunda Snell, who was his brother's girlfriend (as

14   well as Angela Pickens' niece), at some point, probably in June, along with Shaunda's mother,

15   waiting down the street from Ms. Pickens' house until police arrived to mediate the problem

16   between Shaunda and her aunt.  RT 320-321.

17          A rebuttal witness, Vielka Briscoe, Pierre Briscoe's wife testified that petitioner

18   lived in their house in part of June, in July and in early August of 1998, moved out for one day

19   on August 5th, then returned on August 6th.  RT 398-400.  She testified she and her husband saw

20   him every day during that period; that her husband had a gun that was kept in the house at night

21   and in the vehicle at night; that petitioner was in the vehicle on occasions with her husband (and

22   sometimes herself), when her husband would leave the apartment, take the gun out of his pocket

23   and place it in the "middle divider" (or center console), making no attempt to hide it, although

24   the gun was not discussed.[12]   RT 399, 401-403.  V. Briscoe testified that, in a conversation she

25

26          [12] Mrs. Briscoe indicated that she and her husband had four children and that her husband
      had obtained the gun for protection against gang members in the neighborhood.  RT 401, 403-

1  had with petitioner when he was in jail, that petitioner told her "he couldn't say that he knew

2  where the weapon was because he would be in a lot of trouble."  RT 404.  She testified that he

3  was concerned about being recorded and stated to her question as to why he could not just tell the

4  truth, that she was not seeing things from his point of view.  RT 405.  According to the rebuttal

5  witness, she was subpoenaed and had not wanted to testify.  Id.  Further, in the motion for a new

6  trial, while the court found that the misstatement constituted prosecutorial misconduct, whether

7  intentional or not, that it was mitigated by information before the jury, inter alia, that there had

8  been a male in the car parked outside her house that she could not identify and that there was "no

9  indication anywhere that money was owed to Mr. Brown."  RT 632-633.  The court noted that a

10  timely objection could have corrected the misstatement.  RT 633.

11         The court's review of the record of this case indicates that petitioner cannot show

12  a fundamental miscarriage of justice has occurred in the limited mischaracterization of the

13  evidence argued by the prosecutor; thus, he cannot overcome the procedural default found by the

14  state court as to this claim.

15         Accordingly, petitioner cannot demonstrate prejudice nor a fundamental

16  miscarriage of justice as a result of the very limited mischaracterization of the evidence in the

17  prosecutor's argument because there is no clearly established Supreme Court authority to support

18  this claim.

19         *Prior Conviction*

20         Petitioner claims also that the prosecutor violated his due process rights in her

21  closing argument by mentioning petitioner's prior convictions to his prejudice.  AP, p. 5.

22         The state court appellate decision, as previously set forth, contained the following

23  stipulation at issue and the court's analysis as to this claim:

24         Defendant asserts next that the prosecutor violated a stipulation
       between the parties as to his 1992 juvenile adjudication.  Like the

25

26  404.

previous claim of error, this one is waived for failure to object or request an admonition when the supposed misconduct occurred.

The parties agreed to the following stipulation: "On or about September 4, 1991, Clifford Tyrone Brown was in the company of three other persons. Two persons from his party stole a vehicle from the person and the presence of Mr. Steve Perez by use of a handgun. Though Mr. Brown did not actively partake in the initial theft of the vehicle, he was present. [¶] Mr. Brown was later seen by Mr. Ed Sherwood operating the vehicle approximately an hour afterwards."[13]  In the prosecutor's first closing argument, however, after reciting this stipulation, the prosecutor added.  "Sounds like a robbery to me."  Defendant did not object or request an admonition at the time.

The parties and the trial court apparently discussed this point later in an unrecorded sidebar conference.  Afterward, to avoid the problem whether the jury would have to be instructed on the elements of robbery in order to decide whether defendant's prior conduct amounted to a felony, the parties agreed to a new stipulation that defendant's conduct did amount to a felony. Counsel then so stipulated before the jury. [fn 2]

> [fn 2] In a subsequent new trial motion, defendant assigned both instances of alleged prosecutorial misconduct as reversible error.  Defense counsel asserted that he had objected to the prosecutor's "robbery" comment at the unrecorded sidebar.  The prosecutor replied that the original stipulation did not bar that comment.  The trial court agreed with both counsel, finding that there had been an objection but that the prosecutor's comment was not misconduct.  The court also found that there had been no objection to the prosecutor's alleged misstatement of the evidence.

Even if counsel objected at the unrecorded sidebar, that objection was not timely.  Moreover, whether or not he ever objected, he never requested an admonition to the jury.  Instead, he agreed to a new stipulation, apparently concluding that that was sufficient to cure any possible harm.  For both reasons, the claim of prejudicial misconduct is waived.  (People v. Davis, supra, 10 Cal.4th at pp. 505-506.)

Because defendant's claims of prejudice are waived, we need not decide whether the prosecutor actually committed misconduct in either instance.  In any event, we see no possibility of prejudice on

---

[13]  This court notes that this stipulation was read to the jury by defense counsel and can be found in the reporter's transcript at page 315.

1
2
3
4

> these facts.  The victim's testimony was corroborated by an
> impartial eyewitness and by the physical evidence and the jury
> evidently found defendant's uncorroborated story unbelievable.
> Thus, there is no reasonable possibility that defendant would have
> obtained a better outcome absent the prosecutor's alleged
> misconduct.

5  Id., at pp. 4-6.

6          This claim, just as is the preceding one, is subject to the same cause and prejudice

7  analysis because the record once again indicates a lack of a contemporaneous objection.  For the

8  reasons stated by the Court of Appeal, there could be no possible prejudice to petitioner on

9  account of the failure to object.  The claim is procedurally barred.

10                     B. Claim 2 - Unconstitutional Jury Instruction

11          Petitioner contends that he was deprived of a fair trial because a jury instruction,

12  CALJIC 2.90, was given which was unconstitutional with regard to the presumption of innocence

13  and reasonable doubt standard and reduced the prosecution's burden of proof.  ATP, p. 5.

14                           *Legal Standard*

15          A challenge to jury instructions does not generally state a federal constitutional

16  claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

17  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

18  interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475

19  (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

20  F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

21  deciding whether a conviction violated the Constitution, laws, or treaties of the United States

22  (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

23  the state trial proceedings to reach the level of a due process violation, the error had to be one

24  involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

25  the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct.

26  at 482.

1    The court gave the following instruction, based on CALJIC 2.90:

2        A defendant in a criminal action is presumed to be innocent until
         the contrary is proved, and in case of a reasonable doubt whether
3        his guilt is satisfactorily shown, he's entitled to a verdict of not
         guilty.  This presumption places upon the People the burden of
4        proving him guilty beyond a reasonable doubt.

5        Reasonable doubt is defined as follows: It is not a mere possible
         doubt because everything relating to human affairs is open to some
6        possible or imaginary doubt.  It is that state of the case which, after
         the entire comparison and consideration of all the evidence, leaves
7        the minds of the jurors in that condition that they cannot say they
         feel an abiding conviction of the truth of the charge.

8

9    RT 433-434.

10       The state appellate court decision succinctly sets forth the following as to this

11   claim by petitioner:

12       Acknowledging that this court is unlikely to find CALJIC No. 2.90
         (1994 rev.) unconstitutional, defendant nevertheless raises this
13       argument in order to preserve his federal constitutional claim.  As
         defendant anticipates, we reject his argument.  (People v. Hearon)
14       (1999) 72 Cal. App.4th 1285, 1286-1287.)

15   AP, Ex. B, p. 6; Answer, p. 17; respondent's Ex. D, p. 6.

16       Citing Lisenbee v. Henry, 166 F.3d 997 (9th Cir. 1999), respondent contends this

17   conclusion was not unreasonable.  Answer, p. 17.

18       Petitioner has highlighted, as the portion of the instruction which he argues

19   violates due process, the following: "that condition that they cannot say they feel an abiding

20   conviction of the truth of the charge."  Petitioner avers that this version of CALJIC 2.90 "fails to

21   specify the 'degree' ... of the certainty required for proof beyond a reasonable doubt," citing Cage

22   v. Louisiana, 498 U.S. 39, 40-41 (1990).  Traverse, p. 16.   Thus, just as in Lisenbee (supra, at

23   999), petitioner's claim is that "the trial court's use of the phrase 'abiding conviction' to explain

24   reasonable doubt did not adequately define the quantum of doubt required for acquittal."   In

25   Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1244 (1999), a case petitioner cites (traverse,

26   at pp. 15, 18-19), the Supreme Court stated, as noted in Lisenbee, at 999, "so long as the court

25

1    instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt

2    [citation omitted], the Constitution does not require that any particular form of words be used in

3    advising the jury of the government's burden of proof. [Citation omitted]."   In Victor, supra, at

4    5, 114 S. Ct. at 1243, the high court noted that there had been only one case in which the

5    reasonable doubt standard had been found to have violated due process, Cage v. Louisiana, 498

6    U.S. 39, 111 S. Ct. 328 (1990).  Petitioner seeks to rely on Cage, supra, in this instance, but in

7    Cage, wherein the standard of review language has since been disapproved by Estelle v.

8    McGuire, 502 U.S. 62, 73, 112 S. Ct. 475, 482 n. 4 (1991), the reasonable doubt jury charge at

9    issue was found to have contained terms which could have allowed a reasonable juror to find

10   guilt based on a degree of proof lower than that required by due process, terms that are nowhere

11   to be found in the instruction at issue.[14]

12           The Ninth Circuit has dealt with the precise issue petitioner raises:

13           Petitioner argues that the phrase "abiding conviction" standing
             alone improperly lowers the government's burden of proof below
14           the "reasonable doubt" standard in violation of the Due Process
             Clause. In Victor, however, the Supreme Court clarified the
15           constitutional requirements for a reasonable doubt standard
             instruction, and expressly condoned the use of a jury instruction
16           that uses the term "abiding conviction" to define the reasonable
             doubt standard. 511 U.S. at 14, 114 S.Ct. at 1247, 127 L.Ed.2d
17           583.

18           The Victor Court held that an instruction need not follow a
             prescribed formula, and rather required only that the trial court (1)
19           convey to the jury that it must consider only the evidence and (2)
             properly state the government's burden of proof. See id. at 13, 114
20           S.Ct. at 1246, 127 L.Ed.2d 583. The Court specifically stated that:
             "An instruction cast in terms of an abiding conviction as to guilt,
21           without reference to moral certainty, correctly states the
             government's burden of proof." Id. at 14-15, 114 S.Ct. at 1247,
22           127 L.Ed.2d 583 (emphasis added); see also Ramirez, 136 F.3d at
             1214 (affirming instruction in which "[t]he jurors were told that
23           they must have 'an abiding conviction of the truth of the charge,'
             i.e., of the defendant's guilt, a correct formulation of the

24

25           [14] In Cage, at 41, 111 S. Ct. at 329, the instruction "equated a reasonable doubt with a
     'grave uncertainty,' and an 'actual substantial doubt, and stated that what was required was a
26   'moral certainty' that the defendant was guilty."

                                                26

1    government's burden of proof under Victor, 511 U.S. at 14-15, 114
     S.Ct. at 1247-48").

2

3    Lisenbee, supra, at 999.

4              Petitioner also contends in particular that the phrase "abiding conviction,"

5    suggests "at best...a standard equivalent to clear and convincing evidence.'" The Ninth Circuit

6    has addressed this argument specifically:

7              Petitioner argues that because the Supreme Court has used the
              phrase "abiding conviction" to describe standards lower than that

8              required in a criminal case (i.e., the clear-and-convincing-evidence
              standard), the phrase no longer supports the level of proof required

9              for reasonable doubt. See, e.g., Colorado v. New Mexico, 467 U.S.
              310, 316, 104 S.Ct. 2433, 2437-38, 81 L.Ed.2d 247 (1984).

10             Petitioner is incorrect for two reasons. First, as discussed above,
              the Supreme Court has, in cases subsequent to Colorado v. New

11             Mexico, affirmed the use of the phrase "abiding conviction" as the
              proper level of proof for the reasonable doubt standard. Second,

12             and more importantly, petitioner incorrectly takes the phrase
              "abiding conviction" in Colorado v. New Mexico out of context.

13             Although the Court did use the phrase "abiding conviction" in its
              definition of the clear-and-convincing-evidence standard, it did so

14             in tandem with the use of the phrase "highly probable." Colorado,
              467 U.S. at 316, 104 S.Ct. at 2437-38, 81 L.Ed.2d 247. The

15             language in the jury instruction in this case, on the other hand, does
              not.

16
              We therefore conclude that there is no reason to depart from

17             established precedent expressly affirming jury instructions cast in
              terms of an abiding conviction.

18

19   Lisenbee, supra, at 999-1000.

20             The jury instruction at issue in Lisenbee is the precise instruction challenged

21   herein.  Because the denial of this claim by the state appellate court was not an unreasonable

22   application of clearly established Supreme Court authority, this claim should be denied.

23             C. Claim 3 - Ineffective Assistance of Counsel

24             *Legal Standard*

25             The test for demonstrating ineffective assistance of counsel is set forth in

26   Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

1   that, considering all the circumstances, counsel's performance fell below an objective standard of

2   reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

3   identify the acts or omissions that are alleged not to have been the result of reasonable

4   professional judgment. Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

5   whether in light of all the circumstances, the identified acts or omissions were outside the wide

6   range of professional competent assistance. Id., 104 S. Ct. at 2066.  "We strongly presume that

7   counsel's conduct was within the wide range of reasonable assistance, and that he exercised

8   acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d

9   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

10           Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at

11   693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

12   counsel's unprofessional errors, the result of the proceeding would have been different." Id. at

13   694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

14   confidence in the outcome." Id., 104 S. Ct. at 2068.

15           In extraordinary cases, ineffective assistance of counsel claims are evaluated

16   based on a fundamental fairness standard. Williams v. Taylor , 529 U.S.362, 391-93, 120 S. Ct.

17   1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

18           The Supreme Court has recently emphasized the importance of giving deference

19   to trial counsel's decisions, especially in the AEDPA context:

20           In Strickland we said that "[j]udicial scrutiny of a counsel's
             performance must be highly deferential" and that "every effort
21           [must] be made to eliminate the distorting effects of hindsight, to
             reconstruct the circumstances of counsel's challenged conduct, and
22           to evaluate the conduct from counsel's perspective at the time."
             466 U.S., at 689, 104 S. Ct. 2052.  Thus, even when a court is
23           presented with an ineffective-assistance claim not subject to
             § 2254(d)(1) deference, a [petitioner] must overcome the
24           presumption that, under the circumstances, the challenged action
             'might be considered sound trial strategy.' Ibid. (quoting Michel v.
25           Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L.Ed. 83 (1955)).
             For [petitioner] to succeed, however, he must do more than show
26           that he would have satisfied Strickland's test if his claim were

1         being analyzed in the first instance, because under § 2254(d)(1), it
2         is not enough to convince a federal habeas court that, in its
         independent judgment, the state-court decision applied <u>Strickland</u>
3         incorrectly.  <u>See Williams</u>, <u>supra</u>, at 411, 65 S. Ct. 363.  Rather, he
         must show that the [ ]Court of Appeals applied <u>Strickland</u> to the
4         facts of his case in an objectively unreasonable manner.

5 <u>Bell v. Cone</u>, 122 S. Ct. 1843,1852 (2002).

6         As petitioner seeks to incorporate the arguments set forth in his original petition

7 (traverse, p. 21 n. 11, pp. 25-26), as to certain of the following claims, and petitioner was

8 previously informed that the vacated findings and recommendations would be reinstated as

9 appropriate, the court now reinstates the prior findings and recommendations as to these claims

10 with any relevant updating or adjustment noted, as well as distinguishing any claim not addressed

11 therein, i.e., Claim 4, below.

12                   *Failure to Challenge Validity of Prior Conviction*

13         Petitioner first argues that counsel was ineffective for failing to challenge the

14 method of proving validity and interpretation of his 1992 juvenile conviction for robbery.  This

15 conviction was used to enhance his sentence.  First, he contends that counsel should have

16 challenged the adequacy of documentation submitted by the prosecutor as evidence of the

17 conviction.  Second, he argues that counsel should have argued that the prior conviction could

18 not have been used as a strike because petitioner did not actively participate in the robbery.

19         As evidence of the prior conviction, the prosecutor presented minutes from

20 juvenile court proceedings.  <u>See</u> RT at 637 (referring to exhibit 23); Clerk's Augmented

21 Transcript, lodged February 18, 2003.  Pages 2-6 of these minutes is a copy of juvenile court

22 petition dated September 6, 1991, charging petitioner with robbery (count 1, Cal. Penal Code

23 § 211), threatening a family member (count 2, Cal. Penal Code § 422) and vehicle theft (count 3,

24 Cal. Vehicle Code § 10851(a)).  As to counts 1 and 2, it was further alleged that petitioner was a

25 principal and that one or more principals were armed with a firearm in violation of Cal. Penal

26 Code § 12022(a).

1          Page 7 of the minutes is a minute order from the Sacramento County Juvenile

2   court dated April 23, 1992.  The minute order describes the nature of proceedings as "Court's

3   ruling on a submitted matter."  The order states that the court found true and sustained count 1,

4   violations of Cal. Penal Code §§ 211 and 12022(a).  The court dismissed counts 2 and 3.  Page 8

5   is a copy of the dispositional hearing, after which petitioner was sentenced to six years.

6          To determine the truth of a prior conviction, "the trier of fact may look to the

7   entire record of the conviction."  People v. Guerrero, 44 Cal. 3d 343, 355, 243 Cal. Rptr. 688

8   (1988).  The documents submitted by the prosecution as evidence of petitioner's prior conviction

9   were part of the record of that conviction.  A challenge by petitioner's counsel to these

10  documents would have been without merit.

11         Petitioner also appears to argue that counsel should have argued that the

12  documents were inadequate to demonstrate that he personally participated in the robbery.

13  Petitioner argues that because he did not personally participate in the robbery, his conviction

14  should not have been used as a strike.

15         Petitioner's counsel did move to strike the prior robbery conviction on grounds

16  that petitioner did not actively participate in the robbery:

17              Yes, your Honor.  I would indicate that because of the youth of Mr.
                Brown at the time of the commission of this act and the
18              underlying–and the facts underlying–the fact in that he did not
                personally use a firearm in this, and the fact that the sustaining of
19              the petition seemed to have been the result of his association with
                the two individuals who actually committed the robbery, I think it
20              would be unfair to subject Mr. Brown to the rather harsh penalties
                that would–he would be subject to if this is used as a prior.
21
                You can't underscore the youth of Mr. Brown at the time enough.
22              Youth often associates because of school and other associations
                with persons who do things that they ordinarily wouldn't have
23              chosen to do.  And the facts underlying this robbery show that two
                other individuals had robbery on their minds with respect to what
24              had occurred on that day, and Mr. Brown just happened to
                associate with them.
25
                And I would note for the record that Mr. Brown denied taking part
26              in the robbery at that time, and to this day denies taking part in the

1    robbery. And on that, I would submit it.

2    RT at 639-640.

3          The court denied the motion to strike.  RT at 643.

4          Under California law, a robbery conviction constitutes a strike.  Cal. Penal Code

5    § 667(c)(9), § 1192.7(c)(19).  There is no California law providing that a robbery conviction may

6    not be used as a strike if the defendant did not personally or actively participate in the robbery.

7    By arguing that petitioner did not actively participate in the robbery, counsel sought to convince

8    the court to exercise its discretion to strike the prior conviction.  Counsel had no grounds to argue

9    that, as a matter of law, petitioner's prior robbery conviction could not be used as a strike

10   because petitioner did not personally participate in the robbery.  Clearly, by virtue of his

11   conviction, petitioner had some participation in the robbery.  That it might have been less active

12   than others is legally immaterial.[15]

13         On December 29, 2003, petitioner filed a motion to supplement this claim.  This

14   motion is really further briefing in support of this claim.  In this motion, petitioner cites the

15   following cases in support of his argument that the prior conviction could not have been used as

16   a strike because he did not personally participate in the robbery:  People v. Rodriguez, 17 Cal.

17   4th 253, 70 Cal. Rptr. 2d 334 (1998) and Gill v. Ayers, 342 F.3d 911 (9th Cir. 2003).  These

18   cases address the use of a conviction pursuant to Cal. Penal Code § 245(a) (currently

19   § 245(a)(1) (assault with a deadly weapon or by force likely to produce great bodily injury) as a

20   strike.  Not all § 245(a)(1) convictions constitute strikes under California law.  342 F.3d at 914.

21

22         [15]A challenge by petitioner to the validity of the prior robbery conviction on grounds that
     it was not supported by sufficient evidence, or that it was procured by ineffective assistance of
23   counsel, may not be raised in this action.  Lackawanna County Dist. Attorney v. Coss, 532 U.S.
     394, 403-04, 121 S. Ct. 1567 (2001) (a defendant generally may not challenge the enhanced
24   sentence through a petition under § 2254 on the ground that the prior conviction was
     unconstitutionally obtained).  Lackawanna does not apply here because it is the method of proof
25   and interpretation in the current criminal action that is at issue, not an attack on attorney
     performance for the previous expired conviction.  To the extent that petitioner actually does
26   challenge the sufficiency of evidence for the expired conviction, no cognizable claim is raised.

1    To qualify a § 245(a)(1) conviction as a strike, the prosecutor must demonstrate that the

2    defendant personally inflicted great bodily injury on any person, other than an accomplice or

3    personally used a firearm or dangerous weapon.  Id.  Section 245(a)(1) may be violated in two

4    ways that would not qualify a conviction under this section as a strike: one may aid and abet the

5    assault without personally inflicting great bodily harm or using a firearm, or one may commit the

6    assault without actually causing great bodily injury.  Id., citing Rodriguez, 17 Cal. 4th at 261, 70

7    Cal. Rptr. 2d at 340.

8            In Rodriguez, the California Supreme Court held that an abstract of judgment did

9    not adequately prove that a § 245(a)(1) conviction qualified as a strike.  Id.  This is because the

10   abstract did not demonstrate that conviction was based on facts which would qualify the

11   conviction as a strike.  Id.  In Gill, the Ninth Circuit found that the defendant should be allowed

12   to testify at sentencing to dispute the evidence associated with a prior crime.

13           Neither Rodriguez nor Gill are applicable herein in that petitioner raises no federal

14   law issue, but merely disputes the rulings of the state courts on matters of state law.  Gill itself

15   involved only the federal issue of whether the Constitution required the state courts to allow a

16   defendant to testify at his Three Strikes hearing.  The state courts in this case have found that the

17   evidence of petitioner's prior was sufficient to qualify under state law for the enhancement.  The

18   undersigned sees no reason, and has no authority, to rule to the contrary.  Moreover, Rodriguez

19   and Gill are not applicable to the instant claim because their reasoning applies only to

20   convictions pursuant to § 245(a)(1).  As discussed above, it is possible for a § 245(a)(1)

21   conviction to not qualify as a strike.  However, a robbery conviction is a strike as a matter of

22   law.[16]

23   \\\\\

24

25           [16]  In his traverse to the amended petition, petitioner largely incorporates the argument he
     set forth in the supplemental briefing noted in the prior findings and recommendations set forth
26   herein.

The denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

### *Failure to Interview Witnesses (and Subpoena them to Present Defense)*

Petitioner argues that his counsel was ineffective for failing to investigate and interview witnesses who would have supported his defense.  In particular, petitioner argues that his counsel should have called his brother, Alex Brown, and Anne Reed Dyson as witnesses.

Attached as Exhibit B to the petition[17] is the declaration of Alex Brown dated March 8, 2000.  Mr. Brown states, in relevant part,

> 3.  In June of 1997, while incarcerated at Califronia [sic] Youth Authority ("Chad"), my girlfriend Shaunda Snell (hereafter "Shaunda") had mechanical problems with her car.
> 4.  As a result of her car problems I sent $200.00 to Shaunda to have her car repaired because it was her only means of transportation to come visit me at "CYA."
> 5.  Shaunda's aunt, Angela Pickens (hereafter "Angela"), convinced Shaunda to let Raymond Lynch ("Raymond") repair her car. At the time Angela was Raymond's girlfriend.
> 6.  Shaunda gave Raymond and Angela a hundred dollars of the money I had sent to purchase a part for the car.  Angela also convinced Shaunda into giving Raymond the other hundred dollars for his labor in advance before he repaired the car.
> 7.  Raymond did not repair and/or work on the car at all.  This started a feud between Shaunda and Angela.
> 8.  Since Raymond did not bother to repair the car and Shaunda and Angela were mad at each other; Raymond and Angela returned the $100.00 car part to the store and got a refund.  They kept the refund.  Then to make matters worse Raymond and Angela illegally sold Shaunda's car to a neighbor who lived down the street from their residence.
> 9.  When Shaunda learned that her car had been illegally sold she called the police to assist in retrieving her car.  Shaunda along with her mother, Anna Dyson, and my brother Clifford Brown went with the police to get the car back.
> 10.  The people who had illegally purchased the car explained they had bought the car from Raymond and Angela.
> 11.  I attempted to rectify the matter and defuse the feud between Shaunda, Angela, and Raymond by placing a telephone [call] to Raymond and Angela from "CYA."  However, my attempt was to

---

[17] This reference is to the original, not the amended, petition.

no avail.  I only called them once from "CYA."

12.  On August 13th, I phoned Raymond and Angela after my release from "CYA[.]"  I told them I was coming to their home to pick up some items of personal property which I had left there prior to my incarceration.

13.  Approximately a month later Clifford Brown and I went to pick up my property from Raymond's house.  I discussed with Raymond the matter about the $200.00 he owed in regards to the incident about Shaunda's car.  Raymond told me that he did not have the money at that time, but, he would repay the money later.

14.  I waited for three or [] months and went back to Raymond's house to try to get the money he owed; I was accompanied by Shaunda, my friend Vincent and his girlfriend.  I asked Raymond about the money.  Raymond was accompanied by some of his friends.  He responded:  "He didn't owe me shit, and if I felt like I wanted to do something," he had "hands."  Meaning, he could fight.  Since his attitude became volatile I started to get out of the car because I thought the situation was going to escalate into a fisticuffs.  But Shaunda and Vincent grabbed me, and said let it go.  So I dismissed the whole incident and got back into the car.

15.  After we left Raymond called the police and lied that I had a gun.  The police came to question me about the incident.  I gave the police permission to search my person and the car for weapons.  There was no weapons found on my person or inside the car.

16.  In the month of May, an argument occurred between my brother Clifford Brown and myself, as a result we stopped communicating with each other.  We did not talk or see each other until after he was arrested for the offense of his current conviction.

17.  In the month of June, I was in a car traveling down San Carlos street in the City of Sacramento and I seen Raymond.  He also seen me.  I did not speak any words to him; I then turned left on 17th, which is a dead end street.  I stopped my vehicle and had a conversation with Vincent who was sitting in his car in front of his grandmother's house with his daughter while awaiting his girlfriend to come out the house with their infant child.

18.  Vincent and I made plans to later meet at a mutual friend's house.  I left and made a U-turn and went across 17th, as I was doing this Raymond, whose house is on the corner of 17th and San Carlos, stood outside his house and waved hello with his hand as I passed by.  I returned his greeting because I did not consider the $200.00 he owed me or his wanting to fight with me on another occasion to have been matters which caused me to harbor any bad vibes toward him.

19.  Later, while in the County Jail, my girlfriend Shaunda informed me that Angela had called the police and told them that my brother and Pierre Briscoe had shot at her car.

20.  I know that my brother and Pierre Briscoe would not have randomly shot at Angela's car without being provoked so I inquired further about the incident because I wanted to ascertain the truth.

21.  I later discovered that Raymond was in his Suburban driving

34

with Angela on the passenger side and one of his friends in the rear seat; he saw Pierre Briscoe and my brother Clifford Brown driving down the street. Raymond tried to run them off the road and started shooting at them. Pierre Briscoe handed Clifford Brown his gun and he fired back because he feared for his life and Pierre Briscoe's life. Raymond was out to kill them for no other reason than Clifford Brown is my brother.

22. After the shooting, Raymond and his friend had Angela to [sic] call the police and give a false report, i.e. she was alone in the vehicle and for no reason in broad daylight my brother Clifford Brown and Pierre started shooting at her in the Suburban.

23. When I learned this information it was apparent that Raymond and Angela were taking the bold step to cover their illegal activities, that is, shooting at my brother and Pierre.

24. My brother Clifford Brown had absolutely nothing to do with the misunderstanding which was between myself and Raymond over $200.00. I know for a fact that a $200.00 debt would not cause my brother and Pierre Briscoe to shoot at anyone. That is plain crazy thinking.

25. While I was in the County Jail I asked my lawyer to tell my brother's lawyer to come and talk with me about my brother's case because I knew there was matters which needed to be resolved.

26. No lawyers or investigator ever came on my brother's behalf to discuss the pertinent information I could have and was willing to provide.

Attached to the petition as exhibit C is a summary by investigator Tony Gane of his September 12, 1998, interview with Anne Reed Dyson. Mr. Gane's summary of Dyson's description of the dispute between Alex Brown and Angela is similar to the description contained in Alex Brown's declaration. As to the shooting incident that led to petitioner's conviction, Gane states,

9. Dyson has also heard that Angela was not alone in her car when the alleged shooting took place for which the defendant has been charged. "I heard there were two other people in the car with Angela in the backseat."

Alex Brown's declaration and Gane's summary contain background information regarding Alex Brown's feud with Raymond Lynch. Petitioner contends that testimony from Alex Brown and Dyson regarding this feud would have supported his defense that Lynch sought petitioner out in retaliation for the feud. The problem with this defense is that the jury could just have reasonably concluded, and may well have, that petitioner was motivated to shoot Pickens in

35

1   retaliation for the money Lynch owed Alex Brown.  [Petitioner to the victim] "Bitch, I heard that

2   you was [sic] disrespecting my brother."  Therefore, had petitioner's counsel called Alex Brown

3   and Dyson to testify as to this background information it is not likely that the outcome of the trial

4   would have been different.

5        Moreover, petitioner's version of the shooting was contradicted by witness Cindy

6   Butler.  Petitioner testified that right before the shooting occurred, Lynch slammed on the brakes

7   of his vehicle, with the right left tire partially resting on the median.  RT at 282.  Briscoe then

8   slammed on his brakes.  RT at 282.  The reverse lights of Lynch's vehicle came on and petitioner

9   saw part of Lynch's upper body and arm extending out and pointing a gun toward him.  RT at

10  283.  Petitioner testified that he and Lynch fired simultaneously at each other.  RT at 283.  After

11  the shots were fired, Briscoe drove over center divider and made a U-turn.  RT at 285-86.

12       Cindy Butler testified that as she drove down Mack Road she heard two pops.  RT

13  at 122.  She saw a guy with his arm hanging out of a Ford Explorer shooting a gun.  RT at 123.

14  She testified that at the time she saw the person with the gun out and firing she did not see

15  anyone else in the area with a weapon.  RT at 125.  The vehicle with the shooter drove by Butler.

16  RT at 125.  The Explorer did a U-turn and pulled up beside her.  RT at 127.  Butler memorized

17  the licence plate and called 911.  RT at 127-128.  Butler saw a gray Suburban with a female

18  driver on Mack Road.  RT at 129.

19       Butler did not testify that she saw two cars stopped on Mack Road with the

20  occupants shooting at each other, which was petitioner's version.  Rather, Butler saw a Ford

21  Explorer moving down the road with the passenger leaning out the window and shooting.  Based

22  on Butler's description of the event, which corroborated Pickens's testimony, it is unlikely that

23  additional evidence regarding Lynch's possible motive to shoot petitioner would have changed

24  the outcome of the trial.

25       In his declaration, Alex Brown states that he later discovered that Lynch shot at

26  petitioner.  According to Gane, Dyson also found out that Lynch shot at petitioner.  Neither the

1    Brown declaration nor the Gane summary state the non-hearsay basis for the assertions that

2    Lynch shot at petitioner.  Petitioner is not entitled to an evidentiary hearing based on these

3    conclusory, unsupported, and inadmissable assertions.  <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th

4    Cir. 1994) (conclusory allegations insufficient to justify an evidentiary hearing).  In any event,

5    had counsel investigated the assertions of Alex Brown and Dyson that Lynch shot petitioner, it is

6    unlikely that outcome of the trial would have been different.  As discussed above, the evidence at

7    trial did not support petitioner's version of events.  It would have been difficult to present

8    credible evidence contradicting the version of events as described by Cindy Butler.

9            For the reasons discussed above, petitioner's claim that his counsel was

10   ineffective for failing to investigate and interview Alex Brown and Ms. Dyson is without merit.

11   Because the denial of this claim by the California Supreme Court was not an unreasonable

12   application of clearly established Supreme Court authority, this claim should be denied.

13           *Failure to Present Self-Defense Collaborating [sic] (Corroborating) Witness*
             *Defense that Petitioner discharged his Firearm as Self-Defense after first being*
14           *fired upon by alleged Victim*

15           In his amended petition, petitioner appears to state this as a supplemental claim

16   to the one immediately preceding.  AP, p. 6.  Neither in the amended petition, however, nor in

17   the traverse does he further flesh out any such claim to the extent that he might have sought to

18   distinguish it from the claim above.  In fact, in his traverse, petitioner only references the

19   supporting argument of his original petition, making no mention at all to this as a distinct claim,

20   and the court does not recognize it as a separate claim, finding it to be subsumed within the

21   immediately prior claim.[18]

22   \\\\\

23   \\\\\

24   _____

25   [18]  The court does not incorporate the prior findings and recommendations as to the denial
     of Marsden Transcript/Ineffective Assistance of Appellate Counsel claim brought in the original
     petition.  The court notes that the petitioner has dropped all reference in his amended
26   petition (or traverse) to said claim, possibly a tacit recognition of its meritlessness.

D.  Claim 4 - Insufficient Evidence re: Prior Conviction

This claim was not presented as a separate straight claim in the original petition. Petitioner requests remand and re-sentencing on the ground that there was insufficient evidence presented as to the prior conviction used to enhance the current conviction and sentence.  AP, p. 6.  Petitioner claims that the state failed to prove all the elements of the earlier conviction beyond a reasonable doubt, only showing the least adjudicated elements in the presentation of court documents, such as photos, fingerprint cards, minute orders and the abstract of judgment, thus only demonstrating a preponderance of the evidence.  Id.  Petitioner does rely on the arguments in his original petition related to this claim (with respect to an ineffective assistance of counsel claim).  Traverse, p. 26.

This claim is subsumed within the ineffective assistance of counsel claim set forth above wherein it has previously been noted that a challenge by counsel on the basis of such a claim would have been without merit because in order to determine the truth of a prior conviction, "the trier of fact may look to the entire record of the conviction."  People v. Guerrero, 44 Cal.3d 343, 355, 243 Cal. Rptr. 688 (1988), and the documents submitted by the prosecution as evidence of petitioner's prior conviction were part of the record of that conviction.

Petitioner challenges respondent's reliance on the superior court's opinion on petitioner's habeas petition because it is the last reasoned decision on the question of whether or not the evidence was sufficient to support the prior strike conviction.  He argues this point because the superior court stated that it could not address the sufficiency of the evidence because at that time petitioner's appeal was before the Third District Court of Appeal and to rule on the question would be to interfere with the appellate court's jurisdiction.  Exhibit C to Answer.

The court continued, however:

The court notes, however, that were the court to address this claim, it would deny such claim because the order of the juvenile court sustaining the petition for a violation of Penal Code 211 with an enhancement under Penal Code section 112022(a) was adequate to prove a juvenile strike prior under Penal Code section

1    1170.12(b)(3) and Welfare and Institutions Code section 707(b)(3).

2    Id.

3           Respondent, while noting that the trial court found the claim procedurally

4    defective in light of the then pending appeal, states that the claim was nevertheless addressed on

5    the merits and denied and that subsequent postcard denials of the habeas petition to the state

6    appellate court and state supreme court render it the last reasoned decision (both in the context of

7    an ineffective assistance claim and as a straight claim).  Answer, pp. 19, 22-23.

8           As noted earlier (footnote 14) to the extent that petitioner attacks the underlying

9    prior conviction itself, petitioner has not stated a cognizable claim in challenging the sufficiency

10   of the evidence for the expired conviction. Lackawanna County Dist. Attorney v. Coss, supra,

11   532 U.S. 394, 403-04, 121 S. Ct. 1567.  Generally, if a prior conviction used to enhance a state

12   sentence is fully expired in its own right, the defendant may not collaterally attack a prior

13   conviction through a § 2254 petition.  Daniels v. United States, 532 U.S. 374, 383, 121 S. Ct.

14   1578 (2001); Lackawanna, supra; Gill v. Ayers, 342 F.3d 911, 919 n.7 (9th Cir. 2003).  The

15   Supreme Court has held that "once a state conviction is no longer open to direct or collateral

16   attack in its own right because the defendant failed to pursue those remedies while they were

17   available (or because the defendant did so unsuccessfully), the conviction may be regarded as

18   conclusively valid."  Lackawanna, at 403, 121 S. Ct. 1567.

19          The Supreme Court has recognized an exception to this general rule when a

20   challenge is raised to an expired conviction in the context of an enhanced sentence "on the basis

21   that the prior conviction used to enhance the sentence was obtained where there was a failure to

22   appoint counsel in violation of the Sixth Amendment, as set forth in Gideon v. Wainwright."

23   Lackawanna, at 404, 121 S. Ct. 1567 (citing Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792

24   (1963)).  See also Daniels, supra, at 382, 121 S. Ct. 1578  ("this rule is subject to only one

25   exception...." when an enhanced sentence is "based in part on a prior conviction obtained in

26   violation of the right to counsel....")

                                          39

1          While, in Daniels, the United States Supreme Court also recognized "that there

2    may be rare cases in which no channel of review was actually available to a defendant with

3    respect to a prior conviction, due to no fault of his own," the Court did not elaborate.  532 U.S. at

4    383, 121 S. Ct. 1578.  In Lackawanna, however, the Supreme Court noted that, as an example, "a

5    state court may, without justification, refuse to rule on a constitutional claim that was properly

6    presented to it."  532 U.S. at 405, 121 S. Ct. 1567.  "Alternatively, after the time for direct or

7    collateral review has expired, a defendant may obtain compelling evidence that he is actually

8    innocent of the crime for which he was convicted, and which he could not have uncovered in a

9    timely manner."  Id.  Such limited circumstances might warrant an exception to the general rule

10   barring a collateral attack upon an expired sentence since a federal habeas petition "directed at

11   the enhanced sentence may effectively be the first and only forum available for review of the

12   prior conviction."  Id. at 406, 121 S. Ct. 1567.

13          Assuming that there is an exception to the rule set forth in Lackawanna and

14   Daniels for "rare cases," the court finds that the circumstances of this case do not justify the

15   application of such an exception.  See Johnson v. United States, 544 U.S. 295, 304 & n.4, 125 S.

16   Ct. 1575 (2005) (stating that the Court has recognized "only one exception" to the prohibition on

17   federal collateral attacks on prior state convictions and declining to explore the possible "rare"

18   second exception).  Petitioner does not demonstrate that there was no channel of review actually

19   available to him with respect to a prior adjudication.

20          Because the denial of these claims by the California Supreme Court was not an

21   unreasonable application of clearly established Supreme Court authority, these claims should be

22   denied.

23          ACCORDINGLY, IT IS HEREBY RECOMMENDED that petitioner's

24   application for a writ of habeas corpus be denied.

25          These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 7/2/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
brow1311.fr

41